State, North Ward National Bank, pros., v. City of Newark.

THE STATE, THE NORTH WARD NATIONAL BANK OF NEWARK, PROSECUTORS, v. THE MAYOR AND COMMON COUNCIL OF THE CITY OF NEWARK.

1. The restriction on the power of the states, in the matter of taxation of national banks, does not arise from the fact that they are created corporations under an act of congress. The states may lawfully tax the property merely of a corporation created by act of congress, in common with other property of the same description throughout the state. But to the extent that such property is invested in the securities of the federal government, it is beyond the power of the states to tax it against the corporation, without permission of congress, for the reason that taxation, in that respect, would be indirectly a tax upon the credit and securities of the federal government.

2. The power of the states to tax, in the hands of stockholders, the stock of national banks, which is invested in federal securities, is derived exclusively from the authority conferred by congress. By the act of congress of 1864, as amended in 1868, power is granted to the states to tax the shares of the stock of national banks, by including them in the valuation of the personal property of the owners. The only restriction on this power of taxation is, that it shall not be at any greater rate than is assessed on other moneyed capital in the hands of individual citizens of the state, and that shares owned by non-residents of the state shall be taxed in the city or town where the bank is located. The mode in which the tax shall be assessed and collected, and the place where it shall be laid on resident stockholders, are left to the discretion of the legislatures of the states in which the banks are respectively located.

3. Paragraph 12 of the amendments of 1875 to the constitution of this state, viz., "Property shall be assessed for taxes under general laws, and by uniform rules, according to its true value," executed itself. It required no legislation to enforce it, and went into effect immediately on the adoption of the amendments, and operated as an abrogation of all special laws for assessing property for taxes. In the assessment of taxes thereafter, property was required to be assessed under the general tax law then in force, which in all respects conformed to the constitutional requirement as to the valuation of property for the purposes of taxation.

On *certiorari.* In matter of taxation.

The following state of the case was agreed upon by the counsel of the respective parties :

The North Ward National Bank of Newark, the prosecutor, is a banking association, organized under the act of Congress of the United States, having its banking house in the city of Newark, in the county of Essex, in the State of New Jersey.

The capital of the said banking association is the sum of $250,000, and its surplus the sum of $11,000.

The stock is largely held by persons who do not reside in the city of Newark, or county of Essex, and a true list of the said stockholders, and their respective places of residence at the time of the tax assessment complained of, are contained in the return made by the defendant to the writ of *certiorari.*

The said banking association is assessed by the municipal authorities of the city of Newark on the whole amount of its capital stock and surplus, under and by virtue of an act of the Legislature of New Jersey, entitled, " A supplement to the act entitled, ' An act relating to the assessment and revision of taxes in the city of Newark, approved March fifteenth, one thousand eight hundred and sixty-six,' " approved April 4th, 1872.

Argued at February Term, 1877, before Justices Depue, Van Syckel and Scudder.

For the plaintiff in *certiorari, Joseph Coult.*

For the defendant, *Henry Young.*

The opinion of the court was delivered by

Depue, J.   The restrictions on the power of the states in the matter of taxation of national banks, do not arise from the fact that they are created corporations under an act of congress.   The exemption of a corporation, created as one of the agencies of the federal government, from taxation by the states, is dependent, not upon the nature of the agent, nor upon the mode of its constitution, but upon the effect

of the tax; whether the tax does, in truth, deprive it of the power to serve the government as it was intended to serve it, or hinder the efficient exercise of its powers. A tax upon the property merely of such a corporation, having no such necessary effect, may be rightfully laid by the states. *Railroad Company* v. *Peniston*, 18 *Wall.* 5.

The moneyed capital of a bank is an entirely different thing from its capital stock. The former is the property of the corporation. It may consist of cash or of bills discounted, or be in part invested in real estate, or in the securities of the federal government. In whatever form it is invested, it is owned by the bank as 'a corporate entity, and not by the stockholders. The stock or shares represent the interests of the shareholders, which entitle them to participate in the net profits of the bank in the employment of its capital, and is a distinct and independent interest or property in the shareholders, held by them like other property. To the extent that the capital is invested in the securities of the federal government, it is beyond the power of the states to tax it as against the corporation, for the reason that taxation in that instance would be indirectly a tax upon the credit and securities of the government. This distinction between the capital of a bank and its stock, is pointed out by Mr. Justice Miller in *National Bank* v. *Commonwealth*, 9 *Wall.* 353, and by Mr. Justice Nelson in *Van Allen* v. *Assessors*, 3 *Id.* 573, as one that has been adopted by the Supreme Court of the United States in adjudicating upon the power of the states in the taxation of national banks. In *McCulloch* v. *Maryland*, 4 *Wheat.* 316, it was held that the Bank of the United States, which was incorporated by act of congress, was taxable by the State of Maryland on lands which were the property of the bank, in common with other real property in the state, and that citizens of the state might also be taxed on the interest which they held in the bank, in common with other property of the same description throughout the state. The distinction is between taxation of a corporation created by or employed by the federal government, and taxation of the

instrumentalities or means of the government in the possession of such corporation. The states may tax banking institutions, but they cannot tax the currency or government bonds belonging to such banks. *Western Union Telegraph Co.* v. *City of Richmond,* 3 *Am. Law Times* (*N. S.*) *Rep.* 149 ; 26 *Gratton.* The cases are cited and commented on by Mr. Justice Strong, in *Railroad Company* v. *Peniston, supra,* and by the court in Western Union Telegraph Co. *v.* City of Richmond. They fully establish the doctrine that the property merely of a corporation, created by act of congress, may be taxed by the states, provided such taxation be not indirectly a tax upon the credit and securities of the federal government. That this principle will apply to the undivided surplus of a national bank, and to other investments of its capital, if the same be not invested in the securities of the federal government, is apparent from the cases above cited. The states possess an inherent power of taxation of such property independently of any grant of authority by congress.

The power of the states to tax in the hands of stockholders, the stock of national banks, which is invested in federal securities, rests upon different grounds. The states have no inherent powers of taxation in that respect. Whatever powers they have of taxation in that form, is derived exclusively from the authority conferred by congress. By the act of congress of June 3d, 1864, (2 *Bright. Dig.* 60, § 41,) as amended by the act of February 10th, 1868, (*U. S. Stat., p.* 34,) the states were empowered to tax the shares of stock of national banks by including them in the valuation of the personal property of the owners in the assessment of taxes. The only restriction on this power of taxation is, that taxation thereon shall not be at any greater rate than is assessed on other moneyed capital in the hands of individual citizens of the state, and that shares owned by non-residents of the state shall be taxed in the city or town where the bank is located. In every other respect, the power of the states to impose the tax is unrestrained. It may be laid on the stock, although the capital of the bank is invested in federal securi-

ties, (*National Bank* v. *Commonwealth*, 9 *Wall.* 573); and be assessed for purposes of taxation at an amount above its par value, if such valuation is made by the state law on other moneyed capital in the assessment of taxes, (*Hepburn* v. *School Directors*, 23 *Wall.* 480); and be separated from the person of the owner, and given a *situs* of its own for the purposes of taxation. *Tappan* v. *Merchants' National Bank*, 19 *Wall.* 490. The mode in which the tax shall be assessed and collected, and the place where it shall be laid upon resident stockholders, are left to the discretion of the legislature of the state in which the banks are respectively located. We must look, therefore, to our own constitution and laws to ascertain whether the assessment in controversy was legally made.

The legislature of this state, by the sixteenth section of the general tax law of April 11th, 1866, (*Nix. Dig.* 954), provided that the stock of national and state banks should be taxed to stockholders in the township or ward wherein the bank is located, and it was made the duty of the bank to retain and pay the amount of the tax out of dividends from time to time declared, and such tax was made a lien on the shares of the stock, and the same were made liable to be sold by virtue of a tax-warrant against the person taxed, as in other cases. By the act of April 1st, 1869, (*Acts*, 1869, *p.* 1149,) stockholders resident in the state were required to be taxed for the stock of national banks in the townships or wards in which they respectively resided, and the bank was to be assessed for stock owned or held by non-residents of this state. In these particulars only, the act of 1866 was altered by the act of 1869. By force of these two acts, the mode of taxing the stock of national banks was this: stockholders, resident in this state, should be taxed therefor in the township or ward where they reside, respectively, and the assessment on the stock of non-resident stockholders should be made in the township or ward where the bank is located, and, in form, against the bank, the tax being a lien on the stock, and payable out of the dividends thereon, at least so far as it was laid for stock owned or held by stock-

holders residing out of the state. · This system of taxation of the stock of national banks, by force of these two acts, became the general law on the subject, in force throughout the state.

.In 1872, by a supplement to "An act relating to the assessment and revision of taxation in the city of Newark," (*Acts,* 1872, *p.* 1165,) the sixteenth and seventeenth sections of the act of April 11th, 1866, were "declared to be in full force and effect, so far as relates to the city of Newark." Upon the idea that, in this obscure way, the sixteenth section of the act of 1866 was revived and re-enacted, without regard to the alterations of it by the act of 1869, as a local and special law in force in the city of Newark, the assessment in question was made. It was made against the bank on its surplus of $11,000, which was held by the bank, and does not appear to have been invested in government securities, and also upon its entire capital stock of $250,000, which was owned by persons residing in the city of Newark and elsewhere in the State of New Jersey, and by stockholders non-residents of this state.

The objection of the prosecutor, that the tax is assessed against the bank, and not to the individual stockholders, should not, under the circumstances, be allowed to prevail. It is purely a formal objection, and is not specifically taken in the reasons assigned. Undoubtedly, a strict adherence to the words of the act of congress would require the assessment to be directly against the individual stockholders. To such an assessment, it would be competent for the legislature to annex a lien on the stock, with a power to sell in satisfaction of the tax of the delinquent stockholders. This, in substance, so far as the interests of the bank are involved, is the effect of this assessment. The tax can only be collected out of the dividends. In *National Bank* v. *Commonwealth,* 9 *Wall.* 353, and *Lionberger* v. *Rouse, Id.* 468–477, the assessments were in form against the bank, and were sustained by the court. While the sixteenth section of the act of 1866 was in force—the tax on all the stockholders being

laid at the place where the bank was located, and paid by the bank—it was the universal custom, adopted for the convenience of all parties, to make the assessment in form against the bank, instead of individual stockholders, and to pay it out of the general funds of the bank, instead of charging the several amounts to the accounts of individual stockholders. Since 1872, this custom has been continued in the city of Newark, for the same reasons of convenience. Without any application having been made to the commissioners of taxation to change the form of the assessment, and transfer it from the bank to individual stockholders, it would be unjust to the public to allow the objection to the form of the assessment to be taken, where no reason presenting the precise ground of exception to the tax has been filed.

The other objection presents the material question in the cause. It is, that the act of 1872, as a local and special act on the subject of taxation, became inoperative by the adoption of Paragraph 12 of the constitution of this state, as amended in 1875. That paragraph is as follows : " Property shall be assessed for taxes under general laws, and by uniform rules, according to its true value."

It was contended by the city counsel that it is a fundamental rule of construction, of universal application, that constitutional provisions will have operation only prospectively. If by this proposition be meant merely that a new constitutional amendment will be inoperative to make null transactions past and done under a pre-existing law, which were valid when the transactions took place, the position is conceded to the fullest extent. The destruction of vested rights, whether by a statute or constitutional amendment, by implication, will never be presumed. *Osborne* v. *Nicholson*, 13 *Wall.* 654. But the argument does not touch the point of this case. For instance, an assessment of taxes made under an existing law, which was repealed after the assessment, but before its collection, is a thing passed and completed, and is unaffected by such repeal. *Town of Belvidere* v. *Warren R. R. Co.*, 5 *Vroom* 193 ; *S. C. in error*, 6 *Id.*

584. So also a conviction and sentence, under a statute in force when judgment is pronounced, will not be vacated, or the term of imprisonment terminated by a subsequent repeal of the statute. But in taxation from year to year, each successive act of taxation is a separate and distinct thing, appealing to a law in force when the tax is laid, to support the imposition.

Nor can it be questioned that a constitutional provision will operate, *proprio vigore*, to repeal existing statutes, if such be the intention of the framers of the instrument. In *People* v. *Supervisors of Westchester*, 12 *Barb.* 446, a constitutional amendment, " that when private property shall be taken for public use, the compensation to be made therefor, when such compensation is not made by the state, shall be ascertained by a jury, or by not less than three commissioners appointed by a court of record, as shall be prescribed by law," was held to abrogate a prior statute providing for a different mode of assessment of the damages. In *Pierce* v. *Delamater*, 1 *Comst.* 17, a statute which disqualified a judge of the Court of Appeals from taking part in the decision of a cause or matter which was determined by him when sitting as a judge in any other court, was held to be abrogated by a constitutional provision subsequently adopted, which prescribed the qualifications of the members of the court, and did not disqualify for that reason. In *St. Joseph Board of Public Works* v. *Patten*, 62 *Mo.* 444, it was held, that a constitutional provision that taxation for school purposes should not exceed forty cents on the $100, executed itself; that it required no legislation to enforce it, and therefore went into effect on the adoption of the constitution. The fifteenth amendment of the constitution of the United States invested the citizens of the United States with the right of exemption from discrimination in the exercise of the elective franchise, on account of race, color or previous condition of servitude. It was so held by the Supreme Court of the United States, in *United States* v. *Reeve*, 92 *U. S.* (2 *Otto*) 215. Congress was, by the same amendment, empowered to enforce that right by

appropriate legislation, that the right conferred might be more effectually protected; but practically, the word "white," used in the constitution of this state in designating the persons entitled to suffrage, was eliminated from that instrument by this amendment, although it was not in fact expunged until the amendment of the state constitution in 1875. Other instances of the self-executing quality of constitutional amendments, abrogating prior institutions, laws and constitutions, and becoming, *proprio vigore*, the supreme law, without legislative aid, will be found in the following cases : *Permoli* v. *First Municipality*, 3 *How.* (*U. S.*) 589 ; *Ochiltree* v. *The Railroad Company*, 21 *Wall.* 249 ; *In matter of Oliver Lee & Co.'s Bank*, 21 *N. Y.* 9. In *Groves* v. *Slaughter*, 15 *Pet.* 449, the court held, that an article in the constitution of the State of Mississippi, that "The introduction of slaves into this state as merchandize, for sale, shall be prohibited from and after the 1st day of May, 1833," was not operative as a law of prohibition. This decision was re-affirmed in *Rowan* v. *Runnels*, 5 *How.* 134, although, in the meantime, the courts of Mississippi had decided otherwise. The decision in the Supreme Court of the United States was put upon the peculiar language of the enacting part of the article—"shall be prohibited"—which they construed to be a command addressed to the legislature to do a certain act, and also on the ground that legislative action was indispensable to carry into effect the object of the prohibition.

The effect of a constitutional amendment on existing laws, is a question of intent. The inquiry is whether the particular provision is one that is capable of self-execution, and was so intended by its framers, or whether legislative action was needed to give it effect, or its operation was designed to be on future legislatures, either to enlarge their powers or restrict them.

Of the constitutional amendments of 1875, the paragraphs which were directed to be inserted in the then existing constitution, as paragraphs eleven and twelve, are illustrations of two of these classes of constitutional provisions.

Paragraph eleven is as follows: "The legislature shall not pass private local or special laws in any of the following enumerated cases, that is to say, laying out, opening, altering, and working roads or highways; vacating any road; town plot, street, alley, or public grounds; regulating the internal affairs of towns and counties; appointing local offices or commissions to regulate municipal affairs; selecting, drawing, summoning, or empaneling grand or petit jurors; creating, increasing, or decreasing the percentage or allowance of public officers during the term for which said officers were elected or appointed; changing the law of descent; granting to any corporation, association, or individual any exclusive privilege, immunity, or franchise whatever; granting to any corporation, association, or individual the right to lay down railroad tracks; providing for changes of venue in civil or criminal cases; providing for the management and support of free public schools. The legislature shall pass general laws providing for the cases enumerated in this paragraph, and for all other cases which, in its judgment, may be provided for by general laws. The legislature shall pass no special act conferring corporate powers, but they shall pass general laws under which corporations may be organized and corporate powers of every nature obtained, subject, nevertheless, to repeal or alteration, at the will of the legislature."

This paragraph is plainly operative only on future legislation. It prohibits, in the future, the adoption of any local or special legislation on the enumerated subjects, and enjoins the passage of general laws on such subjects. Its prohibition is laid on, and its commands addressed to, subsequent legislatures only. Its effect is upon what the legislature may do in the future, and not upon what has been done by it in the past.

Then follows paragraph twelve: "Property shall be assessed for taxes under general laws, and by uniform rules, according to its true value." The change in the language of this command from that in the preceding paragraph, is significant, inasmuch as the two paragraphs follow in immediate

succession.  The mandate is not, as it is in the preceding paragraph, addressed to the legislature.  It would have been easy and quite natural for the framers of the constitutional amendments to have added the subject of this paragraph to the preceding one, and have enjoined the passage by the legislature of general laws on this subject also, if it had been the intention of the authors of the amendments to leave the execution of the policy in this paragraph established to the legislature in its discretion.  But the framers of the amendments determined otherwise.  They declared that " property should be assessed "—which is a new and distinct process every time taxation is made—" under general laws."

At the time these constitutional amendments were drafted by the commissioners, and were voted on by the people, general laws for the assessment of property for taxes were in force, fulfilling completely the requirements of this paragraph. The act of 1866, (*Nix. Dig.* 951), under which taxes were assessed generally in the state, was a law that, in all respects, fulfilled the new constitutional requirements as to the valuation of property for the purposes of taxation.  As amended by the act of 1869, which classified shares of national banks with other personal property of citizens of the state, a general law, in the usual acceptation of that term, was then in force in the state, which provided for assessing the property on which the present tax is laid, at its true value.  These laws not being inconsistent with the constitutional amendment, continued to be applicable to taxation after the amendment went into effect.  *Hill* v. *Hunt, Spenc.* 476.  In the then condition of the tax laws, no new legislation was indispensable to carry into effect the policy established in the adoption of this amendment.  To accomplish the result which was intended, nothing more was necessary that the abrogation of special and local laws on the subject, which were inconsistent with the existing general law.  To effect that result, a repealer, by express words, was not necessary.  Where it clearly appears that it was the intention of the law-making power to prescribe a uniform rule, which shall be the only rule applicable to the

entire subject, all laws inconsistent therewith are repealed, without the use of express words of repeal. *Industrial School* v. *Whitehead*, 2 *Beas.* 290 ; *State* v. *Comm'rs of R. R. Taxation*, 8 *Vroom* 228 ; *S. C.*, 9 *Id.* 472. That it was intended by this amendment to establish a uniform rule, which should be the only rule for assessing property, is so plainly manifested in the language used as to admit of no doubt.

With a general tax law in existence, conforming in every particular to the constitutional requirements, it would have been useless to require the legislature to re-enact its provisions. There being no power to coerce the legislative department to enact laws, to have left the execution of the policy on which the paragraph was founded to depend on legislative action, might have defeated, or, at least, delayed the consummation of the plan of taxation devised by the framers of the amendments. To reach a result so easily attainable, and secure, beyond a peradventure, the proposed end, the commission commanded that property should be assessed under general laws, and by a necessary implication interdicted assessments for taxes thereafter under special laws.

Nor should the circumstances connected with the adoption of the constitutional amendments of 1875 be overlooked in the search after the intent of this amendment. The two grievances which, in a great measure, led to the creation of a commission to frame amendments to be proposed for adoption by the people, were the existence of a multitude of local and special laws on a variety of subjects, and the inequality of taxation arising from local and special laws. To have abrogated all special laws in existence by the proposed amendments, would have led to great confusion, and was impracticable. The commission, therefore, contented itself with a mandate to the legislature to pass general laws on the subjects enumerated in the eleventh paragraph, and an injunction against the passage of local or special laws on such subjects in the future. No such embarrassments or difficulties were in the way of the immediate execution of the proposed scheme of taxation under general laws. General laws were then in

force, adequate to accomplish the purpose, and no embarrassment or confusion could arise from the assessment of property under such laws. Consequently when the commission came to deal with taxation, they departed from the formula in which special laws were interdicted in the eleventh paragraph, and declared that property should be assessed for that purpose under general laws. It only required such a declaration to give effect at once to the will of the law-makers.

The argument so strongly urged in favor of holding this paragraph to be operative only on future legislation—that it is placed under the legislative head—ought not to be permitted to overcome the clear and unequivocal language employed. As a prohibition on future legislation at variance with the policy adopted for the present and the future, the paragraph was not inappropriately put in that place. The constitutional commission was dealing with the subject of local and special laws—conspicuous among which, in the history of past legislation, were local and special laws on the subject of taxation. In doing so, they naturally grouped together all the provisions they proposed to adopt to remove the evils arising from that class of legislation. They provided for special legislation on the enumerated subjects in the eleventh paragraph, by prohibiting it in the future, and empowering the legislature to pass general laws thereon, and then, in a separate paragraph, made a present command, that " property shall be assessed for taxes under general laws and by uniform rules, according to its true value."

In my judgment, the act of 1872, which was a special law for the taxation of the stock of national banks in the city of Newark, was abrogated by the twelfth paragraph of the constitutional amendment. It was not only a special law for assessing property for taxes, but also afforded a striking instance of the violation of uniformity of rule in the assessment of property for taxation, and of inequality in taxation under special and local laws. Under its sway, the owners of the stock of national banks located elsewhere in the state, who resided in, and were taxable in, the city, were free from

taxation upon their stock; and the owners of stock in banks: located in the city, who resided elsewhere in the state, were subjected to double taxation—taxation in the city, under the act of 1872, and taxation at their places of residence, under the act of 1869.

Taxation of national banks in the city, after the constitutional amendments were adopted, could only be made under the act of 1866, as amended by the act of 1869. The assessment, therefore, cannot be sustained, except in so far as it is consistent with these two acts. By these acts, the stock owned, by persons not residents of this state is taxable in the township or ward where the bank is located, and that owned by residents of this state is taxable in the township or ward where the owners respectively reside.

The stock owned by non-residents of the state, was lawfully taxed in the ward where the banking house is located. With respect to the stock owned by persons residing in the city of Newark, it was taxable to them in the city. It does not appear that any of such stockholders whose stock was included in the valuation, did not reside in that ward. The court, therefore, will not disturb the assessment, so far as this stock is concerned. But so far as relates to the stock owned by persons residing in this state, but not in the city of Newark, the assessment is set aside. These individuals were taxable on their stock at their places of residence.

The undivided surplus—not being invested in federal securities—might have been lawfully taxed against the bank; but the state law seems to contemplate that it be taxed in connection with the capital stock in the hands of the stockholders. It should, therefore, be taken into consideration in estimating the taxable value of the stock.

Counsel will make a calculation which will carry into effect the opinion of the court, and enter a rule accordingly.